## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 17 2019, 9:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Lauren A. Jacobsen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeffrey Henderson,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | June 17, 2019<br><br>Court of Appeals Case No.<br>18A-CR-3115<br><br>Appeal from the Dearborn Circuit Court<br><br>The Honorable James D. Humphrey, Judge<br><br>Trial Court Cause No.<br>15C01-1711-F4-32 |

**Crone, Judge.**

# Case Summary

[1] Jeffrey Henderson pled guilty by open plea agreement to seventeen counts of level 4 felony burglary. The trial court sentenced him to an aggregate eighty-eight-year executed term. Henderson now claims that his sentence is inappropriate in light of the nature of the offenses and his character. Finding that he has failed to meet his burden of demonstrating that his sentence is inappropriate, we affirm.

# Facts and Procedural History

[2] During a two-month period between August and October 2017, deputies from the Dearborn County Sheriff's Department responded to reports of seventeen home burglaries. The burglar's pattern of conduct included prying open a door or window and stealing cash, power tools, weapons, jewelry, and various electronics. Investigating officers used physical evidence to trace the burglaries to forty-three-year-old Henderson, who was on probation and had a criminal record that included seventeen prior burglary convictions. Meanwhile, Henderson had been arrested and was in the county jail on an unrelated drug dealing charge. Detectives Carl Pieczonka and Norman Rimstidt interviewed Henderson at the jail, and Henderson admitted to committing the burglaries by using a screwdriver to pry open the doors and windows. He agreed to accompany the officers to the various homes, describing how he entered each home and the items he stole.

[3]     The State charged Henderson with seventeen counts of level 4 felony burglary, plus a habitual offender count. Henderson entered an open plea agreement whereby he would plead guilty to the seventeen burglary counts. In exchange, the State dismissed the habitual offender count, a level 2 felony drug dealing charge in another cause, and probation revocation petitions pending in two counties. After his guilty plea hearing, Henderson phoned his wife from the jail. He told her that based on the trial court's apparent concern over his mental health history, he believed that his mental health issues could be his "loophole." State's Ex. 2.

[4]     Three days later, Henderson filed correspondence with the trial court claiming that he had been confused, did not know what was real, and was unsure about his plea. The trial court appointed two psychologists to evaluate Henderson's mental competency. Dr. Ed Connor examined Henderson and initially found him mentally incompetent. After reviewing several jailhouse recordings, including phone calls between Henderson and his wife and Henderson's interview with Detectives Pieczonka and Rimstidt, Dr. Connor concluded that Henderson had been exaggerating his symptoms and malingering during his initial interview. As a result, he submitted a letter to the trial court withdrawing his initial finding of incompetency and concluding instead that Henderson was mentally competent. Psychologist Don Olive examined Henderson and also found him to be mentally competent. Based on these findings, the trial court found Henderson competent and accepted the plea agreement.

The trial court conducted a sentencing hearing, took matters under advisement, and sentenced Henderson to an aggregate eighty-eight-year executed term, comprising seventeen eight-year terms, eleven of which were to run consecutively. The court identified as aggravators Henderson's lengthy criminal history, which includes nineteen felony convictions, seventeen of which are for burglary, his probation status at the time of the offenses, his deceit upon the court concerning his mental health, and the advanced age of three of the victim homeowners. The court identified as slightly mitigating Henderson's decision to plead guilty, his physical and mental health issues, and potential hardship on his family. Henderson appeals his sentence. Additional facts will be provided as necessary.

## Discussion and Decision

Henderson asks that we review and revise his sentence pursuant to Indiana Appellate Rule 7(B), which states that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). When a defendant requests appellate review and revision of his sentence, we have the power to affirm or reduce the sentence. *Akard v. State*, 937 N.E.2d 811, 813 (Ind. 2010). In conducting our review, our principal role is to leaven the outliers, focusing on the length of the aggregate sentence and how it is to be served. *Bess v. State*,

58 N.E.3d 174, 175 (Ind. 2016); *Foutch v. State*, 53 N.E.3d 577, 580 (Ind. Ct. App. 2016). This allows for consideration of all aspects of the penal consequences imposed by the trial court in sentencing, i.e., whether it consists of executed time, probation, suspension, home detention, or placement in community corrections, and whether the sentences run concurrently or consecutively. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). We do "not look to see whether the defendant's sentence is appropriate or if another sentence might be *more* appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Foutch*, 53 N.E.3d at 581 (quoting *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied* (2014)). The defendant bears the burden of persuading this Court that his sentence meets the inappropriateness standard. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016).

[7] In considering the nature of Henderson's offenses, "the advisory sentence is the starting point the Legislature has selected as an appropriate sentence." *Green v. State*, 65 N.E.3d 620, 637-38 (Ind. Ct. App. 2016), *trans. denied* (2017). When determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that "makes it different from the typical offense accounted for by the legislature when it set the advisory sentence." *Holloway v. State*, 950 N.E.2d 803, 807 (Ind. Ct. App. 2011).

[8] The trial court sentenced Henderson to an aggregate eighty-eight years for seventeen level 4 felonies, each of which carries a sentencing range of two to twelve years, with a six-year advisory term. Ind. Code § 35-50-2-5.5. Indiana

Code Section 35-50-1-2(c) affords the trial court the discretion to impose sentences for multiple counts either consecutively or concurrently, after considering the aggravating and mitigating circumstances. Because our legislature has included level 4 felony burglary on the list of "crimes of violence," the trial court is not limited in the total consecutive terms of imprisonment it may impose. *Id.*; Ind. Code § 35-50-1-2(a). Here, the court imposed eight-year executed sentences on each of the seventeen counts and ran only eleven of them consecutively.

[9] Henderson correctly asserts that his burglaries did not involve violence. He claims that he specifically chose to burglarize homes where he knew the owners would not be present. That said, he appears to have surveilled his victims, which indicates premeditation. His numerous break-ins produced a large cache of contraband, including jewelry, firearms, alcohol, cash, electronics, and power tools. Moreover, he attempted to eliminate incriminating evidence by repeatedly filing down the screwdriver that he used to pry open his victims' doors and windows to remove trace amounts of paint that could be tied to each crime scene. By all accounts, Henderson's current crime spree was fine-tuned and vast in scope, with seventeen home burglaries in just over two months' time. Three of the homeowners were elderly. Victim impact letters introduced during sentencing indicate that although the victims were not home during Henderson's burglaries, they nevertheless experienced fear, financial loss, and a sense of violation. In short, the nature of Henderson's offenses does not militate toward a shorter sentence.

[10] Likewise, Henderson's character does not militate toward a shorter sentence. We conduct our review of his character by engaging in a broad consideration of his qualities. *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other grounds on reh'g*, 11 N.E.3d 571. "When considering the character of the offender, one relevant fact is the defendant's criminal history." *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied* (2016). Henderson's juvenile record includes robbery involving the placement of a metal object to a female victim's throat. As a seventeen-year-old, he was waived to adult court for theft of firearms. His extensive adult criminal record includes nineteen prior felony convictions, seventeen of them for burglary. In all, Henderson has amassed thirty-four burglary convictions. He has failed to respond to lenient sentencing options, as is evidenced by his previous probation revocation and the fact that he was serving probation at the time he committed the current offenses. During his previous stints of incarceration, he accumulated twenty-nine reports for misconduct, including intimidation, battery, and throwing bodily waste on a nurse.

[11] Henderson touts his guilty plea and cooperation with law enforcement as reflections of a positive character. While a guilty plea may be mitigating where the defendant accepts full responsibility and saves the State the expense of preparing for and conducting a trial, "a guilty plea may not be significantly mitigating when it does not demonstrate the defendant's acceptance of responsibility or when the defendant receives a substantial benefit in return for the plea." *McCoy v. State*, 96 N.E.3d 95, 98 (Ind. Ct. App. 2018) (quoting

*Anglemyer v. State*, 875 N.E.2d 281, 221 (Ind. 2007), *opinion on reh'g*). With respect to Henderson's guilty plea, we observe that soon after he entered the plea, he attempted to cast doubt on it and notified the trial court that he was confused and unsure what was real, essentially claiming mental incompetence. Additionally, he received a substantial benefit in the dismissal of a habitual offender count, a level 2 felony narcotics dealing charge in another cause, and two probation revocation petitions. Thus, by pleading guilty, he reduced his overall sentence exposure by about fifty years. *See* Ind. Code § 35-50-2-8(i)(1) (court shall impose additional fixed term of six to twenty years for habitual offender convicted of level 1 through level 4 felony); *see also* Ind. Code § 35-50-2-4.5 (level 2 felony carries sentencing range of ten to thirty years with seventeen and one-half-year advisory). We find Henderson's cooperation with law enforcement to be linked to the State's favorable plea offer and similarly beneficial to him. At the time that Henderson gave the jailhouse interview in which he admitted to committing the seventeen burglaries, he was in pretrial custody facing a level 2 felony drug dealing charge in another cause. He accompanied law enforcement officers to those crime scenes and also showed them the locations of some previously unreported burglaries. His cooperation with law enforcement paid dividends in the form of dismissal by plea agreement of his most serious charge.

[12] Henderson also suggests that we take into account his drug addiction and mental and physical health issues because they have resulted in "a reduced capacity to appreciate the wrongfulness of his actions and control his impulses."

Appellant's Br. at 12. Henderson's history of drug and alcohol abuse dates back to his teen years and includes regular use of marijuana, cocaine, and crack, and most recently, an addiction to opiates. Although he has intermittently participated in treatment programs, he has not sustained any prolonged success. Henderson's approach to funding his drug problem through serial burglary appears more methodical than impulsive and reflects negatively on his character. As for his physical health, the record indicates that he has bad knees, gall bladder issues, and some level of kidney failure. However, he has failed to make a compelling argument that he would receive inadequate care for these ailments while serving time in the Department of Correction.

[13] When it comes to Henderson's mental health, the record is less than clear. Henderson testified that he had been diagnosed with post-traumatic stress disorder and paranoid schizophrenia. A report from the Department of Correction/Miami Correctional Facility indicates that Henderson's diagnosis was "Antisocial Personality Disorder." Appellant's App. Vol. 4 at 25. Based on Henderson's apparent lucidity during recorded jailhouse conversations and the final reports from two psychologists, the trial court found Henderson to be exaggerating and embellishing his mental health issues and concluded that his "malingering raises questions as to the existence or severity of any mental health issues." Tr. Vol. 2 at 147.

[14] While we in no way wish to intimate that Henderson's mental health issues are entirely feigned, we, like the trial court, find it difficult to determine the actual extent of those issues. The record does indicate that Henderson has

embellished and exaggerated them to manipulate the system. For example, Dr. Connor, who conducted Henderson's mental competency evaluation, reversed his initial opinion that Henderson lacked mental competency after reviewing the jailhouse recordings. In his letter to the court explaining his change of opinion, Dr. Connor wrote, in pertinent part, that the recordings show that Henderson "was clearly coherent and was very well aware of his legal circumstances and potential options." State's Ex. 2. The doctor also wrote that Henderson's reference to his mental health history as "his 'loophole' … strongly suggests deceitfulness." *Id*. He described Henderson as "able to intellectually and insightfully discuss his legal competency" during the recorded conversations, and as being "coherent, talkative, and display[ing] a very different intellectual and verbal demeanor than he did in his [mental] evaluation." *Id*. Dr. Connor also noted how "clearly coherent" Henderson was in his recorded interview with the detectives, providing them information that was relevant and specific. *Id*. The doctor concluded his letter to the court by stating, "I must respectfully change my opinion that [Henderson's] 'deficient mental capacity compromises his ability to rationally assist his attorney in preparing his defense at this time.' I now believe that [he] was malingering during my evaluation of him…. it appears from the audio recordings that Mr. Henderson was quite astute at malingering." *Id*.

[15] At Henderson's competency hearing, Dr. Connor again described Henderson as "sound[ing] very legally intelligent" in the jailhouse recordings and reported that during one phone call, Henderson had talked to his wife about doing legal

research and referred to his mental issues as a "loophole" for getting an open plea and probation. Tr. Vol. 2 at 40. During that same call, Henderson also said, "I ain't no dummy." *Id*. The trial court agreed, noting Henderson's lucidity and attention to detail during his recorded interview with the detectives, and found that Henderson had committed deceit toward the court. Based on our review of the record, we, too, believe that Henderson is "no dummy" but instead is an opportunist and manipulator of the system with which he has become so familiar. His character simply does not merit a shorter sentence.

[16] Finally, while we are mindful that Henderson's sentence effectively amounts to a life sentence, given his age, it reflects a lifetime of criminal activity that includes not only the current seventeen home burglary convictions but also seventeen prior burglary convictions, as well as felony convictions for intimidation and theft of firearms and failure to respond to lenient sentencing options. Applying our Rule 7(B) legal criteria, which includes the deference we must afford the trial court, we conclude that Henderson has failed to meet his burden of demonstrating that his sentence is inappropriate in light of the nature of his offenses and his character. Consequently, we affirm.

[17] Affirmed.

Bradford, J., and Tavitas, J., concur.